# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

ANNIE OAKLEY ENTERPRISES, INC.    )
AND RENEE GABET    )
    )
   Plaintiffs and Counter-defendant,    )
    )    CASE NO: 1:21-CV-187
v.    )
    )
KINSALE INSURANCE  COMPANY,    )
    )
   Defendant and Counterclaimant.    )

## OPINION AND ORDER

This litigation represents a cautionary tale for insurance carriers that disclaim coverage and decline to defend their insureds under a reservation of rights. Plaintiffs Annie Oakley Enterprises, Inc. ("Annie Oakley") and Renee Gabet ("Gabet") obtained a stipulated $1.3 million judgment against Rise N Shine Online LLC ("RSO") in a trademark infringement suit they filed in the United States District Court, Southern District of Indiana, Indianapolis Division. *See Annie Oakley Enter. Inc, et al. v. Rise N Shine Online, et al.,* 1:19-CV-1732 (S.D. Ind.) ("Underlying Suit"). Defendant Kinsale Insurance Co. ("Kinsale"), RSO's insurer, declined coverage and a defense to RSO in that suit. Now Annie Oakley and Gabet want Kinsale to pay the judgment. They filed suit in this Court seeking a declaratory judgment that Kinsale must indemnify RSO for the consent judgment obtained in the Underlying Suit. (Am. Compl., ECF No. 78). They also assert a breach of contract action against Kinsale claiming they are third-party beneficiaries of the insurance contract between RSO and Kinsale.

Before the Court are cross-motions for summary judgment. (ECF Nos. 93, 103). The parties have fully briefed the motions (ECF Nos. 94-98, 102, 104-107). As the Court began

working to resolve the motions, it discovered a potentially dispositive issue that had not been briefed by the parties. The Court identified the issue and ordered supplemental briefing (ECF No. 110) which the parties have now provided. (ECF Nos. 113-118). With all the briefing received, the Court turns now to the resolution of the competing motions for summary judgment.

**DISCUSSION**

## 1. Factual Background

Annie Oakley manufactures and sells beauty products. (Kinsale's Stmt of Facts, ECF No. 94, ¶1) ("Kinsale Facts"). Annie Oakley's products come in different fragrances, and each fragrance is a different brand with its own corresponding mark. (*Id.* ¶2). In 2000, Annie Oakley began selling products bearing the mark "Rise N Shine." (*Id.* ¶3). Gabet individually registered the "Rise N Shine" mark with the United States Patent and Trademark Office ("USPTO"). Gabet then licensed the "Rise N Shine" trademark to Annie Oakley, which is the company she owns.

RSO is a limited liability company authorized to do business in Florida. At some point in 2015 and beyond, RSO began selling products using the mark "Rise N Shine" in its business.[1] In May 2016, RSO applied to register the "Rise N Shine Online" mark with the USPTO, and in its application, represented that it had been using the mark in commerce since March 1, 2015. On September 1, 2016, the USPTO refused to register RSO's proposed mark explaining that "[r]egistration for the applied-for mark [was] rejected because of a likelihood of confusion with marks in U.S. Registration Nos. 2549750 and 3990283." (*Id.* ¶10). These are the same marks registered to Gabet. Although the USPTO refused to register RSO's proposed mark, RSO

---

[1] The parties dispute exactly when in 2015 RSO was selling these products, but that dispute is immaterial to the outcome of these motions.

continued selling products bearing the infringing mark on Amazon.com and on its website. (*Id.* ¶12).

Kinsale is a surplus lines insurance carrier. On March 20, 2019, Kinsale issued surplus lines Life Sciences General Liability–Claims Made policy, bearing Policy Number 0100083536-0, to RSO with an effective date of March 20, 2019, through March 20, 2020. (ECF No. 87-3) ("Policy").[2] The Policy consists of a Declarations page, a Life Sciences General Liability Coverage Form ("Coverage Form")—the main body of the Policy—and several amendatory endorsements. (*Id*). The Coverage Form is broken down into Sections. Section I sets out the coverages, of which there are two. There is a Bodily Injury and Property Damage Liability coverage ("Coverage A") and, at issue in this case, a Personal and Advertising Injury Liability coverage ("Coverage B"). (*Id.* at 6, 9). Each coverage expressly states, "No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B." (*Id*. at 6, 10). In short, there are no coverages in the Coverage Form, or the Policy for that matter, other than the two listed above.

Coverage B's Insuring Agreement provides for an initial grant of coverage for "personal and advertising injuries." That initial grant of coverage is then limited to "personal and advertising injuries caused by an offense arising out of [the insured's business], but only if: the offense was not committed before the 'retroactive date', if any, shown in the Declarations…" (*Id.* at 10). The Retroactive Date in the Declarations page is the same as the Policy's effective date, March 20, 2019. (Policy, at 2)

---

[2] Page references to the Policy and any endorsements are referenced based on the page number of the ECF filing, not the page number listed on the bottom corner of the exhibit.

The Policy's definition section defines "personal and advertising injuries" to include "injury …arising out of one or more the following offenses: …(f) the use of another's advertising idea in your advertisement. (Policy, p. 23, ¶17(f)). "Advertisement" is defined as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers…" (*Id.* at p. 21).

The Policy includes a laundry list of exclusions applicable to Coverage B alone (Policy, pp. 10-11, ¶2(a)-(l)); and others that are applicable to Coverages A and B (*Id.* at pp. 11-14(a)-(t)). Relevant to this dispute is the exclusion for Unauthorized Use of Another's Name or Product, which excludes from the insuring agreement: "'[p]ersonal and advertising injury'" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers." (*Id.* at p. 11(i))("Unauthorized Use Exclusion").

The Policy also consists of amendatory endorsements that modify the various Coverages under the Policy. At issue here, is the Exclusion -- Business Conduct endorsement ("Business Conduct Endorsement" or "Endorsement") which purports on its face to modify "Life Sciences General Liability Coverage" and add an exclusion for certain business conduct:

**This endorsement modifies insurance provided under the following:**
**LIFE SCIENCES GENERAL LIABILITY COVERAGE**

The following exclusion is added to this policy:

**Business Conduct**

This insurance does not apply to "bodily injury" or "property damage" or "personal and advertising injury" arising directly or indirectly out of, related to, or, in any way involving:

> (1)    Any actual or alleged anti-trust law violation, unfair competition, price fixing or agreement or conspiracy to restrain trade;

(2)    Any actual or alleged infringement of copyright, patent, trademark, service mark, right of publicity, slogan, trade secret, trade dress, trade name, or other intellectual property;

(3)    Actual or alleged false advertising, false designation of origin, product disparagement, trade libel, or other causes of action arising out of unfair competition;

(4)    Any actual or alleged violation by any "insured", or by anyone with the "insured's" knowledge, of any law or regulation imposing criminal liability; or

(5)    Any products or goods manufactured, sold, handled or distributed or work completed by the "insured" or others operating under the direction or control of the "insured" in violation of any law, statute or ordinance of any federal, state or municipal government, or any agencies thereof, including violations of the Lanham Act or other unfair competition statutes.

(Policy, p. 50).

On April 30, 2019, Plaintiffs initiated the Underlying Suit suing RSO (and others) under several theories, all sounding like versions of trademark infringement. One of these theories, appearing in an amended complaint,[3] was a claim for "Use of Advertising Idea." In its count for Use of Advertising Idea, Plaintiffs alleged that sometime after April 1, 2019, RSO used the words 'rise' and 'shine' in its URL for products, in its social media advertising, in its webpages, and used its advertising idea in its advertisements.

RSO tendered the amended complaint to Kinsale seeking a defense and indemnification under the Policy. On October 17, 2019, Kinsale disclaimed coverage. (ECF No. 94-14 at 26). The basis of the disclaimer was Kinsale's argument, repeated now in this case, that the offending conduct occurred outside the Retroactivity Date in the Policy and thus, the Insuring Agreement

---

[3]Among other changes to the first complaint, the amended complaint removed the allegation that RSO registered a URL http://www.riseshineonline.com on November 24, 2014.

did not authorize coverage for the claims made in the Underlying Suit. Kinsale also asserted that the Unauthorized Use exclusion and the Business Conduct Endorsement barred coverage.

RSO eventually settled its case with Plaintiffs. (Settlement Agreement, ECF No. 97). The stipulated settlement, reduced to a Final Judgment and Permanent Injunction, attributed $1,330,836 in damages to the "use of advertising idea" – Count II of the amended complaint in the Underlying Suit. (Amended Judgment, ¶10A, ECF No. 94-23, "Judgment, ¶__").[4] No damages were attributable to any other claim in the Underlying Suit. Additionally, the Judgment contains the following stipulated facts:

- that RSO has "used Plaintiffs' advertising ideas" in its advertisements, "including but not limited to URLs, social media account names, webpages for products and on product labels." (Judgment, ¶3)

- "those URLs and social media account names have been broadcast to the general public for the first time sometime after April 1, 2019, and were for the purpose of attracting customers, and in fact, did attract customers for [RSO]." (*Id.*)

- RSO "has used Plaintiffs' advertising idea, including Plaintiffs' advertising ideas described above, to its benefit and to the detriment of Plaintiffs, though such use was not necessarily unfair." (Judgment ¶5).

- RSO has promoted its own products using Plaintiffs' advertising ideas to call attention to [RSO's] products and business and to proclaim desirable qualities to increase Defendant Rise N Shine Online LLC's business. (*Id.*)

---

[4]The Court is well-aware of the Underlying Suit and the suggestive findings made in the Southern District about potential misconduct in that case that could impact this case. The original judgment from the Southern District of Indiana can be found at ECF No. 61 of the Underlying Suit. The Southern District of Indiana found the case to be fraught with significant attorney misconduct – so much so that in a 42-page decision detailing Attorney Overhauser's obstreperous behavior, he was sanctioned over $86,000 in attorney fees to be paid directly from his law firm to Amazon, another defendant in that case. (Underlying Suit, Sanctions Order, ECF No. 257; filed in current case at ECF No. 94-22). Amazon also made claims that Plaintiffs "may have included false statements of fact in their stipulated judgment disposing of their claims [against RSO] in order to make fraudulent future claims against [RSO's] insurance company." (*Id.* at 357 p. 38). Because the Southern District wanted to "remove itself from any participation in conduct that may later develop into something nefarious," the Court amended the stipulated judgment "to clarify that the matters contained therein were agreed upon by the parties and do not constitute factual or legal findings made by the Court." (Underlying Suit, ECF No. 257 at p. 38).

- RSO has generated approximately $4,000,000 in revenues from its use of Plaintiffs' advertising idea. Plaintiffs have suffered damages of at least $1,330,836 as a result of the use of Plaintiffs' advertising ideas by [RSO] in its advertisements. [RSO's] advertisements have included printed notices provided to the public about [RSO's] products for the purpose of attracting customers that included Plaintiffs' advertising idea (*Id.*)

After the judgment was entered, Plaintiffs then separately agreed with RSO that they would not seek to collect the judgment from RSO but would instead pursue collection from Kinsale under the Policy. (Covenant Not To Execute, ECF No. 98) ("Covenant").

Plaintiffs then filed suit in this Court seeking: a declaratory judgment that RSO was entitled to coverage under the Policy in the Underlying Suit and Kinsale is obligated to indemnify RSO for $1,330,836 as set out in the Amended Judgment (Count 1) and, alternatively, a declaratory judgment that the intellectual property coverage of the Policy is illusory due to the breadth of the Business Conduct Endorsement (Count II). They also brought claims for breach of contract as a third-party beneficiary (Count III); and a request to execute on the Judgment through proceedings supplemental (Count IV). (Am. Compl., ECF No. 78).

Kinsale brought counterclaims asserting that (1) there is no coverage under the Policy (Count I); (2) RSO knowingly infringed on Plaintiffs' rights to the mark Rise N Shine such that the Policy exclusion for Knowing Violations precludes coverage (Count II); (3) RSO used the Plaintiff's name in its domain name so that the exclusion for Unauthorized Use of Another's Name in the Policy eliminates coverage (Count III); (4) the alleged offense by RSO took place prior to the retroactive date so that the Policy exclusion for Prior or Known Claims eliminates coverage (Count IV); (5) RSO infringed on the Plaintiffs' registered trademark and other intellectual property rights such that the Business Conduct Endorsement precludes coverage (Count V); and (6) the Settlement Agreement between Plaintiffs and RSO was the result of collusion and tainted by bad faith (Count VI). (Amended Answer, ECF No. 87). Kinsale asks the Court to declare that

the Insuring Agreement does not provide coverage under the Policy or, alternatively, that one of the enumerated exceptions outlined in its counterclaims bar coverage.

Kinsale has moved for summary judgment on Counts I, III and IV of the Plaintiffs' Amended Complaint and on its counterclaims Counts I, III, IV, V and VI.[5] The Plaintiffs have cross-moved for summary judgment on Counts I, III, and IV of its Amended Complaint and on all of Kinsale's Counterclaims.

## 2. **Legal Standard**

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v.Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255. The  fact  that  the parties have filed cross-motions for summary judgment does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d

---

[5] Although it brought a counterclaim asserting that an exclusion for "Knowing Violations" (Count II) applies, neither Kinsale nor Plaintiffs mention that exclusion in their briefs. This is true despite Plaintiffs' assertion that they are seeking summary judgment on all counterclaims. The Court considers this claim abandoned and DISMISSES the claim.

558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

### 3.  **Analysis**

The competing summary judgments address three separate "buckets" of claims asserted in this case. In the first bucket are the insurance coverage related claims, which include Plaintiffs' argument that coverage for the Judgment exists under the Policy and Kinsale's arguments that various exclusions bar coverage. The second bucket holds the arguments involving the Plaintiffs' assertion that Kinsale must indemnify RSO and pay the Judgment. There, Kinsale questions whether the Settlement Agreement and Covenant are collusive and made in bad faith such that any duty to indemnify it may have can be excused. Inside the final bucket seems to be a hodge podge of everything else. Included in this group are Plaintiffs' claim that they are third-party beneficiaries to the insurance contract and their claim for proceedings supplemental requesting an order to execute and garnish Kinsale's assets.  Each bucket of claims are separately addressed below.

### A.  **Insurance Coverage Questions**

#### i.    *Choice of Law*

In evaluating the insurance coverage questions presented here, the Court must first tackle the choice-of-law issue. A federal court sitting in diversity applies the choice-of-law rules of the state where it sits, Indiana in this case. *W. Bent Mut. Ins. v. Arbor Homes LLC*, 703 F.3d 1092, 1095 (7th Cir. 2013). "Generally, Indiana courts will give effect to the parties' agreement as to controlling law." *Brill v. Regent Commc'ns, Inc.*, 12 N.E.3d 299, 306 (Ind. Ct. App. 2014) (citations omitted). Thus, the first step is to determine whether there is a contractual agreement regarding the choice of law.

Although neither party mentions or directs the Court to it, the Policy provides that Kinsale, "will submit to the jurisdiction of any court of competent jurisdiction within the United States[] or Canada" and accepts that "…[a]ll matters arising under this Policy shall be determined in accordance with the choice of law rules of such court." (Policy, at 19). In essence then, the Policy punts the choice of law analysis to this Court to determine the appropriate substantive law to apply.

For contract claims, Indiana applies the substantive laws of the state that has the "most intimate contacts" with the claim – which Plaintiffs suggest that the parties agree is Florida. *Nat'l Union Fire Ins. of Pittsburgh, PA v. Standard Fusee Corp.*, 940 N.E.2d 810, 814 (Ind. 2010). But a Court need not resolve the question of which state's substantive law to apply to claims unless there is "a conflict between state laws important enough to affect the outcome of the litigation." *Litsinger v. Forest River, Inc.*, 536 F. Supp. 3d 334, 357 (N.D. Ind. 2021) (quoting *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004) (internal quotation marks omitted)); *see also Tricor Auto. Grp. v. Dealer VSC Ltd.*, 219 N.E.3d 206, 216 n.7 (Ind. Ct. App. 2023) (stating that if there is no germane conflict of laws, then the law of the forum state should be applied).

In its brief, Kinsale at least ponders whether a conflict between Indiana or Florida law exists and whether such a conflict, if it existed, would be enough to affect the outcome. The Plaintiffs, though, make a blanket statement that the parties "agree that [the] Policy with RSO is governed by Florida law." (ECF No. 104 at 6). But that is not what Kinsale said or argued.[6] Instead, Kinsale argues that it makes little difference which law applies because Indiana and Florida have similar rules for construing insurance contracts. The Court agrees. For this reason, the Court finds

---

[6] Kinsale does agree in its answer that Florida law is applicable to the Policy, however, as set out in the body of the Opinion, where there is no conflict between the laws of the competing jurisdictions, this Court is well within its authority to apply Indiana law.

that Indiana governs the contract interpretation questions posed under the Policy. *Tricor Auto Grp.,* 219 N.E.2d at 216 n. 7.

   ii.  *General Construction of Insurance Contracts*

  Under Indiana law, provisions of insurance contracts are subject to the same rules of construction as other contracts; the court interprets an insurance policy with the goal of ascertaining and enforcing the parties' intent as revealed by the insurance contract. *Westfield Companies v. Knapp*, 804 N.E.2d 1270, 1274 (Ind. Ct. App. 2004). In accomplishing that goal the court construes the insurance policy as a whole, rather than considering individual words, phrases, or paragraphs. *Wright v. Am. States Ins. Co.,* 765 N.E.2d 690, 692 (Ind. Ct. App. 2002). If the contract language is clear and unambiguous, it should be given its plain and ordinary meaning. *Id.*

  The interpretation of an insurance policy is primarily a question of law for the court, and therefore well-suited for summary judgment. *Id.* (citation omitted). "It is the burden of a person or entity seeking coverage under an insurance policy to establish that the claim at issue comes within the policy's insuring provisions." *Scottsdale Ins. Co. v. Harsco Corp.*, 199 N.E.3d 1210, 1219 (Ind. Ct. App. 2022).

  When considering exclusions to coverage, the burden shifts to the insurer to prove that an exclusion to coverage applies. *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 725 (Ind. Ct. App. 2004). Exclusions or limitations in an insurance policy must be plainly expressed, and any doubt or ambiguity in the policy must be read in favor of the insured. *Am. Family Life Assurance Co. v. Russell*, 700 N.E.2d 1174, 1177 (Ind. Ct. App. 1998). "The exclusionary clause must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusion into play, and any doubts to the coverage under the policy shall be construed against the insurer to further the policy's basic purpose of indemnity." *Id.*

Where an insurer has received notice of a lawsuit, Indiana law expects the insurer to act. "An insurer, having knowledge its insured has been sued, may not close its eyes to the underlying litigation, force the insured to face the risk of that litigation without the benefit of knowing whether the insurer intends to defend or to deny coverage, and then raise policy defenses for the first time after judgment has been entered against the insured." *Liberty Mut. Ins. Co. v. Metzler*, 586 N.E.2d 897, 902 (Ind. Ct. App. 1992). Indeed, "an insurer that has received notice of a lawsuit and believes it has no duty to defend should either file a declaratory judgment action or hire counsel to defend its insured under a reservation of rights." *Greene v. Westfield Insurance Company,* 963 F.3d 619, 628 (7th Cir. 2020). "Not doing so is risky and done at the insurer's 'own peril.'" *Id*. (quoting *Metzler*, 586 N.E. 2d at 901). Indeed, as the Seventh Circuit acknowledges:

> An insurer who fails to defend but is later found to have a duty to indemnify foregoes having any input in how the underlying lawsuit is litigated. They might give up certain defenses, for example. Or, they might be forced to pay a settlement that they would have negotiated differently had they defended the suit themselves. Given these real concerns, an insurer has an incentive to defend (perhaps under a reservation of rights letter), and when an insurer does not, it does so at its own risk.

*St. Paul Guardian Ins. Co. v. Walsh Constr. Co.*, 99 F.4th 1035, 1044 (7th Cir. 2024).

Unlike the duty to defend,[7] which is assessed at the beginning of a lawsuit before anyone knows if there is a loss, a duty to indemnify arises once an insured has incurred liability in an

---

[7]An insurer's duty to defend is broader than its duty to indemnify. *Seymour Mfg. Co., Inc. v. Commercial Union Ins. Co.,* 665 N.E.2d 891, 892 (Ind. 1996). An insurer is obligated to defend its insured against suits alleging facts that might fall within the coverage of the policy. *Fed. Ins. Co. v. Stroh Brewing Co.*, 127 F.3d 563, 566 (7th Cir. 1997). "[T]here is essentially only one standard—that the allegations of the complaint, including the facts alleged, give rise to a duty to defend whenever, if proved true, coverage would attach." *Id.* Only if there is no possible factual or legal basis on which the insurer might be obligated to indemnify will the insurer be excused from defending its insured. *Prop.-Owners Ins. Co. v. Virk Boyz Liquor Stores, LLC*, 219 F. Supp. 3d 868, 873 (N.D. Ind. 2016) (citing Lee R. Russ, 14 COUCH ON INSURANCE § 200:12 (3d ed. 2007)). Finally, an insurer must defend an action even if only a small portion of the conduct alleged in the complaint falls within the scope of the insurance policy. *See Curtis–Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir. 1994). So "[i]f the policy is otherwise applicable, the insurance company is required to defend even though it may not be responsible for all of the damages assessed." *Ind. Farmers Mut. Ins. Co. v. N. Vernon Drop Forge, Inc.*, 917 N.E.2d 1258, 1267 (Ind.

underlying claim against it for which coverage exists under the Policy. *See Alicea v. Thomas,* 2014 WL 4311079, at *3–4 (N.D. Ind. Sept. 2, 2014) ("a duty-to-indemnify claim is not ripe until liability has been established."). And that is squarely where this case is positioned. Kinsale opted not to defend the Underlying Suit and the result of that decision is that it is now precluded from raising issues or defenses that it could have raised in that action. Instead, the Court focuses on whether the Judgment in the Underlying Suit triggers coverage of the Policy. Mindful of these basic tenets of insurance law, the Court turns now to the parties' arguments relating to the coverage issues.

### iii. *Insuring Agreement, Retroactivity Date and the Prior Known Claims Exclusion*[8] (Plaintiffs' Am. Compl. Count I; Counterclaim Counts I and IV)

When construing an insurance contract, the Court begins with the language of the initial grant of coverage before addressing any exclusionary language. *See Sheehan Const. Co. v. Cont'l Cas. Co.,* 935 N.E.2d 160, 162 (Ind. 2010); *Indianapolis Racquet Club, Inc. v. Cincinnati Ins. Co.*, 658 F. Supp. 3d 683, 691 (S.D. Ind. 2023) (applying Indiana law and stating that "exclusions don't matter unless the insured first shows that the policy covers its claim"); *Hartford Cas. Ins. Co. v. Evansville Vanderburgh Pub. Libr.*, 860 N.E.2d 636, 646 (Ind. Ct. App. 2007) ("[I]f the insuring clause does not extend coverage, one need look no further. If coverage exists, exclusions must then be considered."). Coverage B contains an Insuring Agreement that provides broad coverage for "personal or advertising injury arising out of [the insured's] business" so long as the offense was not committed before the retroactive date, here March 20, 2019. (Policy, pp. 9-10). The parties do

---

Ct. App. 2010) (citation omitted). "In other words, in for a penny, in for a pound." *Prop.-Owners Ins. Co.*, 219 F. Supp. 3d at 873.

[8]The parties do not separately brief the Prior Known Claims exclusion that Kinsale raises in its Fourth Counterclaim. The Court reasons that because the issue of whether the offenses occurred after the retroactive date in the Insuring Agreement and the issue of whether the exclusion eliminates coverage because the offenses took place prior to the retroactive date, are largely the same. Thus, the Court believes that its conclusion that the offenses took place after the retroactive date also decides that counterclaim.

not dispute that retroactive date provisions are generally enforceable. *See Savers Prop. & Cas. Ins. Co. v. Indus. Safety and Environmental Servs., Inc.,* 2014 WL 1230727, at *7 (N.D. Ind. March 25, 2014) (no coverage where wrongful acts occurred before the retroactive date). Instead, the parties dispute whether the retroactive date condition was met here.

Plaintiffs' position is short and sweet; since the Judgment reflects that the infringing conduct began on April 1, 2019 – after the retroactive date – they argue the Insuring Agreement applies to provide coverage. Kinsale's argument is not so short and sweet. Kinsale asserts that the "record" shows that RSO began its infringement on the Plaintiffs' trademark "Rise n Shine" years before the retroactive date. It also points to a second clause, a deemer clause, in the insuring agreement that "deems" all offenses that "are logically or causally connected by any common fact, circumstance, situation, transaction, event, service, advice or decisions" to have occurred at the time "the first of such offenses took place." (Policy, p. 10 ¶1(d)). Because the infringing conduct, in its view, began in 2015, the retroactive date condition has not been met.

To support its position, Kinsale points to *Savers Prop. & Cas. Ins. Co.,* 2014 WL 1230727, at *7, but the Court finds that case is unhelpful, particularly because the procedural posture of that case is wholly different than in this one. There, the insureds were sued for civil RICO violations and the insurer denied coverage under its professional liability policy claiming that the alleged acts of misconduct occurred before the retroactive date for professional liability coverage. Rather than sit back and observe the litigation in silence, the insurer wisely filed a declaratory judgment action seeking to "enforce its interpretation of the policy." *Id.* at *4. Under those circumstances, the Court looked to the facts recited in the amended complaint in the underlying suit which clearly alleged that the alleged acts of misconduct began outside the retroactive date and continued into the retroactive date. *Id.* at *6. The end result was that the Court agreed with the insurer that the conduct

was not covered under the insuring agreement and declared the insurer had no duty to defend or indemnify in the underlying action.[9]

Kinsale urges the Court to make the same findings here. It references exhibits and extrinsic evidence[10] outside the Judgment that it contends contains factual evidence showing that the infringement began well before the retroactive date. But Kinsale's argument fails to account for the procedural posture it has put itself in by disclaiming coverage, refusing to defend under a reservation of rights (or seek declaratory relief), and waiting until after a Judgment to make its contract defenses. Simply put, the time for Kinsale to argue the underlying facts of the litigation has passed. *Dave's Detailing, Inc. v. Catlin Ins. Co.*, 13 F. Supp. 3d 935, 940 (S.D. Ind. 2014) ("an insurer that refuses to defend must protect its interests by filing a declaratory judgment action for a judicial determination of its obligations under the policy or defend its insured under a reservation of rights."). Indeed, it is long-established that "the doctrine of collateral estoppel applies to insurance contracts and an insurer is ordinarily bound by the result of litigation to which its insured is a party, so long as the insurer had notice and the opportunity to control the proceedings." *Liberty Mut. Ins. Co. v. Metzler*, 586 N.E.2d 897, 900 (Ind. Ct. App. 1992) (citing *Hoosier Casualty Co. v. Miers,* 27 N.E.2d 342 (Ind. 1940); *Snodgrass v. Baize*, 405 N.E.2d 48 (Ind. Ct. App. 1980)).

The Judgment in the Underlying Suit states conclusively that Plaintiffs suffered an "advertising injury" for "use of another's advertising idea" arising out of RSO's business beginning after April 1, 2019. This is covered by the Insuring Agreement and beyond the Policy's

---

[9] Kinsale also cites an 11th Circuit case and a Middle District of Florida decision for the propositions that the deemer clause can bring a claim that may be inside the retroactive date outside the retroactive date. That proposition is not disputed by the Plaintiffs. But those cases are also not cases where an insurer is in the procedural position Kinsale is here.

[10] Kinsale references records from the USPTO office, verified internet records, the Complaint, the Motion for Sanctions in the Underlying Suit, and the complaint and amended complaint in the Underlying Suit.

retroactive date.[11] The Judgment, then, falls within the scope of the insuring agreement, subject to any applicable exclusions.

####    iv.    *Unauthorized Use Exclusion* (Counterclaim Count III)

Next, Kinsale argues that the exclusion for Unauthorized Use of Another's Name or Product precludes coverage under the Insuring Agreement. That provision excludes "personal and advertising injury" resulting from the unauthorized use of another's name or product in an "e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers." Kinsale argues that because the Judgment states that RSO used Plaintiffs' advertising ideas, in its advertisements, including in URLs, social media account names and webpages for products and on product labels for the purpose of attracting customers, this exclusion applies to preclude coverage.

Plaintiffs disagree and argue that the Unauthorized Use exclusion does not reach website or webpage content as was set out in the Judgment. To that end, they cite the 11th Circuit's decision in *St. Luke's Cataract & Laser Inst., P.A. v. Zurich Am. Ins. Co.*, 506 F. App'x 970, 974 (11th Cir. 2013) ("*St. Luke's*"), a case that interpreted a nearly identical exclusion in a policy issued by the insurers in that case. There, the insuring agreement of the policy at issue covered copyright infringement but excluded such infringement if it "[arises] out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers." Although the copyright claim was based on the insured's wrongful use of the contents, layout, and design of plaintiff's website, the district court determined that the complained of conduct fell within the exclusion. On appeal the 11th Circuit disagreed:

---

[11]Kinsale does not contest that the Policy defines "personal and advertising injury" to include "the use of another's advertising idea in your advertisement."

> …The exclusion enumerates three specific places in which a name or product might be used without authorization: an email address, a domain name, or a metatag. The three enumerated locations are very specific; a website is not included among them. Furthermore, if the exclusion were meant to include websites generally, it would be odd to enumerate two constituent elements of a website (its domain name and metatags) but neglect to mention the website itself. To conclude otherwise would allow the "similar tactics" language to swallow the narrow language used in the exclusion and turn it into a catch-all exclusion for the use on the internet in any way of material belonging to another.

> … Such a broad reading of "similar tactics" would also go well beyond the type of conduct that the exclusion's specific language is meant to target. The exclusion mentions the use of another's name or product in an email address, domain name, or metatag. Using a term in a metatag or domain name can be a way to attempt to attract people searching for that term via a search engine. Thus, using someone else's name or product in a metatag or domain name might be an attempt to divert their customers to a different website. Using another's name or product in an email address raises similar concerns about implying a false affiliation.

> Sanderson's unauthorized use of St. Luke's website content, standing alone, does not implicate these same concerns. Indeed, his website did not even mention St. Luke's. We will not read the "similar tactics" language as sweeping into the exclusion a broad range of conduct that does not implicate the same concerns as the tactics specifically mentioned.

*St. Luke's,* 506 F. App'x 970 at 976–77. Ultimately, the 11th Circuit refused to apply the exclusion, finding in favor of the insured and noting that the insurers drafted the exclusion "using restrictive language directed at a particular set of concerns that are not implicated by the use of another's copyrighted content on a website." *Id.* at 977.

Kinsale responds to Plaintiffs arguments, in essence, by saying that at least some of the conduct in the Underlying Suit and Judgment fell within the Unauthorized Use exception and Plaintiffs never sued RSO for its website conduct. This latter statement is belied by both the amended complaint in the Underlying Suit and the Judgment's reference to RSO's use of Plaintiffs' advertising ideas in RSO's webpage content. But that is precisely why Kinsale should have participated in the Underlying Suit – so it could make this argument in the first instance. As Plaintiffs point out, where some of the claims were potentially encompassed by the Policy, Kinsale

had a duty to defend the entirety of the action. Kinsale didn't. The facts in the Judgment fall outside the Unauthorized Use exception and Kinsale is hard-pressed now to rummage through the weeds and pick and choose defenses that could have been fleshed out in the Underlying Suit. The Court finds that the Unauthorized Use Exclusion does not preclude coverage.

       iv.    *Business Conduct Endorsement* (Plaintiffs' Am. Compl. Count II,[12] Counterclaim Count V)

Finally, the Court turns to Kinsale's argument that the Policy contains an Endorsement that adds an exclusion for certain business conduct and, in turn, precludes coverage for the Judgment in the Underlying Suit. In their initial round of briefing, the parties focused on whether the exclusionary language expressly excludes the Judgment. But the Court's review of the Endorsement's language uncovered a more fundamental concern that must be resolved before the Court can interpret the breadth of the exclusionary language: Does the Endorsement apply to the coverages in the Policy at all?

As set out in the factual background, the main body of the Policy is headed "Life Sciences General Liability Coverage *Form*." (emphasis added). Within that form are two coverages -- Bodily Injury and Property Damage Liability coverage (Coverage A) and Personal and Advertising Injury Liability coverage (Coverage B). Other than Coverages A and B, there are no other coverages.

The Endorsement, however, contains the following language:

This endorsement modifies insurance provided under the following:
**LIFE SCIENCES GENERAL LIABILITY COVERAGE**

---

[12] Plaintiffs' claim in Count II of their Amended Complaint seeks a declaration that the Court declare the coverage for intellectual property under the Policy illusory given the expansive language in the Business Conduct Endorsement. Although the parties' have not expressly briefed that issue, the Court's conclusion that the Business Conduct Endorsement does not modify the "personal and advertising injury" coverage in the Policy forecloses this claim. Count II of Plaintiffs' Amended Complaint is DISMISSED.

But there is no "Life Sciences General Liability Coverage" in the Policy. In the Court's mind, then, this begged the question of "to what, then, does the Endorsement apply?" (ECF No. 110 at 2).

> The Court foreshadowed the argument it anticipated from Kinsale:
>
> The Court assumes that [Kinsale] will respond that the Endorsement references the Coverage Form. But [Kinsale] shows, throughout the endorsements, the ability to call out a coverage *form* instead of a coverage. In fact, the endorsement right before the Endorsement states: This endorsement modifies insurance provided under the following: ALL COVERAGE FORMS (ECF No. 94-14 at 12). This is one of many times this "ALL COVERAGE FORMS" language appears in the endorsements. (ECF No. 94-13 at 7, 16; ECF No. 94-14 at 3, 6, 22, 23).

(ECF No. 110) (emphasis added).[13] And, with a few exceptions addressed below, Kinsale's supplemental brief tracks what the Court foresaw.

Kinsale first argues that after the Court ordered supplemental briefing, the parties reached a stipulation in which they agreed the Endorsement is not ambiguous and should be applied as written. Kinsale cites Indiana authority, presumably to ask the Court to enforce the stipulation. *Steffek v. Client Servs. Inc.,* 948 F.3d 761, 769 (7th Cir. 2020) ("once made, a stipulation is binding unless relief from the stipulation is necessary to prevent a manifest injustice or the stipulation was entered into through inadvertence or based on an erroneous view of the facts or law.").

As proof that there was, in fact, an agreement, Kinsale's counsel represents that he drafted a stipulation, provided it to Plaintiffs' counsel with the following email:

---

[13] At the time the Court ordered the additional briefing, it had only begun its review of the cross-motions for summary judgment. In ordering the additional briefing, the Court took at face value the statement in Plaintiffs' brief and the representation that Florida law would apply to the insurance contract issues. The parties, in turn, briefed the issue using Florida law. However, as set out in this Opinion, because the Court finds no substantive difference between the laws of Indiana or Florida that would be outcome determinative, the Court applies Indiana law. The Court reiterates that the parties have not pointed to any determinative difference in the laws of Indiana and Florida with respect to the determination of whether contract language is ambiguous or in the interpretation of ambiguous contract provisions. Therefore, regardless of whether Indiana or Florida law applies, the Court would reach the same conclusions.

> It was good talking to you earlier regarding the attached order from the Court. As we discussed, this email confirms we both agree the Exclusion – Business Conduct Endorsement is unambiguous and should be applied as written …

(ECF No. 114-1). Kinsale argues that Plaintiffs' counsel "did not write back to object or express a different understanding of their agreement." (ECF No. 114 at 3). Predictably, Plaintiffs' counsel responds that the parties did not reach agreement. He represents that when he received the email with a draft stipulation from Kinsale's counsel, he phoned Kinsale's counsel, and told him it was unacceptable. (ECF No. 115 at 2).

Setting aside the obvious problem that the parties have filed no stipulation and the Court is not inclined to dive any further into these waters to determine whether one was ever reached, there is a bigger problem. While "the parties to a lawsuit are free to stipulate to factual matters... the parties may not stipulate to the legal conclusions to be reached by the court." *Saviano v. Comm'r,* 765 F.2d 643, 645 (7th Cir. 1985). And "[w]hether a contract is ambiguous is a question of law for the court." *W. Ohio Pizza, Inc. v. Clark Oil & Refining,* 704 N.E.2d 1086, 1091 (Ind. Ct. App. 1999). So, stipulation or no stipulation, it doesn't matter.

Kinsale also asserts that Plaintiffs never raised ambiguity as an affirmative defense and has never argued during the litigation that the coverage to which the Endorsement applies is ambiguous. Kinsale implies that, for this reason, Plaintiffs are merely seizing on the Court's inquiry to support their cause. They also imply that the Court is foreclosed from asking the question or has overstepped its judicial role by asking it since it was never raised by the parties. The Seventh Circuit, however, tells the Court otherwise. "[W]hile a judge should never engage in advocacy from the bench, he or she has an obligation to raise legal issues that the parties have over-looked or neglected. After all, the judge is on the bench in the first place (we trust) because of superior legal background, expertise, or credentials, and for that reason '[should] not sit as a passive

observer who functions solely when called upon by the parties.'" (citation omitted). *Jones v. Page,* 76 F.3d 831, 850 (7th Cir.1996); *S. Illinois Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co.*, 302 F.3d 667, 677 (7th Cir. 2002) (noting that once a judge raises an issue that the parties did not argue, it is required to allow the parties to be heard on the issue. Because the Court found inconsistent language among the endorsements throughout the Policy, the Court believed the use of such language called into question which coverage the specific Endorsement modified. This was an issue overlooked by the parties and the Court was well within its authority to raise the issue and allow the parties an opportunity to file briefs on the question of ambiguity, all of which it did.

With those two preliminary arguments out of the way, the Court now reaches the fundamental question at issue: Does the language of the Endorsement unambiguously identify the coverage to which it applies? The simple answer is it does. It states that "This endorsement modifies insurance provided under the following: **LIFE SCIENCES GENERAL LIABILITY COVERAGE."** So, it either unambiguously identifies non-existent coverage in the Policy or it is ambiguous as to which coverage it modifies.

If the former is true, the Endorsement applies to a coverage that is not in the Policy, and the court must give that language its plain and ordinary meaning. *Barclay v. State Auto Ins. Cos.,* 816 N.E.2d 973, 975 (Ind. Ct. App. 2004). If the latter is true, the language is subject to multiple interpretations and must be construed against Kinsale.

Kinsale discourages both views. Instead, it argues that modifying coverage granted in the main policy is simply "what endorsements do." (ECF No. 114 at 5). It urges the Court to read the Endorsement language to apply to all coverages in the Policy. Kinsale goes on to cite case law that encourages the Court to read the Policy as a whole and to give meaning to every provision.

That's precisely what this Court has done. It has looked at all 22 endorsements in the Policy and identified inconsistent language used in those endorsements to identify the coverage to which they apply. Some modify "all coverage *forms*" (ECF No. 87-3 at 26, 35, 40, 43, 59); while others modify certain "coverages," such as Allied Health General Liability Coverage, Life Sciences General Liability Coverage, or Life Sciences Products/Completed Operations Liability Coverage (*Id.* at 27, 29, 36, 42, 45, 47, 50, 51). What this demonstrates is that Kinsale *did* attach endorsements excluding coverages that are not contained in the Policy. And this further instructs that Kinsale knows the difference between a "coverage form" and a coverage. But it did not apply its knowledge of the difference in its drafting. And that is the problem. Careless drafting lends itself to ambiguity. This is one such case. Kinsale urges the Court to adopt an interpretation that equates a coverage to a coverage form. It asks the Court to find that what it "meant to say" was that the Endorsement applies to the Life Sciences General Liability Coverage *form*. Otherwise, Kinsale argues, the Court would render the Endorsement meaningless.

But it is meaningless, at least to the extent it purports to modify a coverage that the rest of the Policy does not contain. Indeed, what is clear and unambiguous is that the Endorsement does not modify a "Coverage Form." It modifies a coverage – one that does not exist in the Policy. The Court sees no way to read the Endorsement differently, especially when confronted by the other endorsements that have more specific language that references "all coverage forms."

A policy is ambiguous only if it is 'susceptible to more than one interpretation and reasonably intelligent persons would differ as to its meaning.'" *Matteson v. Citizens Ins. Co. of Am.*, 844 N.E.2d 188, 192 (Ind. Ct. App. 2006); *Morris v. Econ. Fire & Cas. Co.*, 848 N.E.2d 663, 666 (Ind. 2006). Here, given the inconsistent language used among the amendatory endorsements, reasonable people could come to different conclusions as to whether the Endorsement modified a

"coverage form" as a whole or a "coverage" as specified in a coverage form. Where the Court finds the language is ambiguous, the Court construes the insurance contract against the insurance company. *Morris,* 848 N.E.2d. at 666. Accordingly, the Court finds that the Business Conduct Endorsement, does not modify the Policy and does not exclude coverage under the Insuring Agreement for "personal and advertising injury."

> vi.    *Summary*

To summarize, the Court finds that the Insuring Agreement provides coverage for the "personal and advertising injury" in the Judgment and no applicable exclusions preclude that coverage. The result is that Kinsale owes a duty to indemnify to RSO.[14] The Plaintiffs' Motion for Summary Judgment on Count 1 of its Amended Complaint and on Counts I, III, IV, and V of Kinsale's Counterclaims is GRANTED; Kinsale's Cross-Motion for Summary Judgment on Counts I, III, IV, and V of its Counterclaims and Count 1 of Plaintiffs' Complaint are DENIED.

**B.    Is Kinsale bound by the Consent Judgment? (Counterclaim Count VI)**

Having found that Kinsale owes a duty to indemnify, the Court turns now to whether Kinsale is bound by the consent Judgment entered into between Plaintiffs and RSO.

Generally, an insurer's failure to defend may give rise to the possibility that the insured will enter into a "consent" or "stipulated" judgment with the claimant, who in turn will seek to enforce the judgment against the insurer. That is exactly what happened here. Kinsale refers to this series of events as forming a *Coblentz* agreement, which is based on *Coblentz v. American Sur. Co. of New York*, 416 F.2d 1059 (5th Cir. 1969). But the Court is not altogether sure that description applies here. *Coblentz* permits the assignment of rights to enforce a breach of insurance

---

[14] But the duty to indemnify RSO for the Judgment is subject to good faith and reasonableness determinations as set forth later in this Opinion and Order. For purposes of the coverage analysis, the Court reads the Judgment at face value. As the parties acknowledge coverage for a judgment and the enforceability of it are two separate inquiries.

contract claim to another party. These agreements arise when the insurance company fails to defend the insured, the insured settles the dispute, and the insured allows the injured third party to sue the insurance company on a theory of bad faith. See *Cawthorn v. Auto-Owners Ins. Co.*, 791 F. App'x. 60, 64 (11th Cir. 2019). "In those circumstances, the insured is left unprotected and may enter into a reasonable settlement agreement with the third-party claimant and consent to an adverse judgment for the policy limits that is collectable only against the insurer." *Perera v. U.S. Fidelity and Guar. Co.*, 35 So. 3d 893, 900 (Fla. 2010).

But this case does not involve an assignment of rights. Neither the Settlement Agreement nor the Covenant contain an express assignment of rights. The Settlement Agreement represents a stipulated settlement between the parties that resulted in a Judgment against RSO. The Covenant promises that Plaintiffs won't execute the Judgment against RSO. Neither mentions any claims against an insurer.

That said, Kinsale wants the Court to call the two agreements together a *Coblentz* agreement and apply Florida law to it. Kinsale believes Florida law is more favorable to its position. But even if the Court could fit the agreements into the *Coblentz* box, the Court cannot identify a legal basis for applying Florida law here and Kinsale doesn't provide any meritorious explanation. The Settlement Agreement and the Covenant expressly include an Indiana choice of law provision. The stipulated Judgment is a Judgment from an Indiana court. Absent a cogent argument that Indiana law should not apply here, the Court will apply Indiana law to the enforceability of the Judgment.

Under Indiana law, a consent judgment will not bind an insurer if the consent judgment was the product of bad faith or collusion. *Midwestern Indem. Co. v. Laikin,* 119 F. Supp. 2d 831, 843 (S.D. Ind. 2000). Nor will it bind the insurer if the consent judgment is not a "reasonable"

settlement of the dispute in the underlying actions. *Id.* As a general rule, "where an insured simply surrendered an obviously winning defense to all liability, that surrender would be evidence of bad faith or collusion and could permit a finding of unreasonableness as a matter of law, especially when linked to a covenant not to execute." *Id.* at 845. The insurer bears the burden to show by clear and convincing evidence that the consent judgment was the product of bad faith or collusion or is unreasonable. *Carpenter v. Lovell's Lounge & Grill, LLC,* 59 N.E.3d 330, 340 (Ind. Ct. App. 2016).

Kinsale first argues that the Judgment was procured by bad faith. It points to suggestive comments made in the Underlying Action, see fn. 4, made by other litigants in that action as well as comments from the District Judge. Second, Kinsale questions whether the Judgment was a reasonable settlement of the dispute between Plaintiffs and RSO. Specifically, Kinsale asserts that the amount of the Judgment is unreasonable and submits what purports to be a damages calculation. Plaintiffs' respond that the negotiated settlement was in good faith and the amount of the Judgment took into account RSO's full exposure in the Underlying Action, which they estimated at over $8,000,000.

Indiana's standard of reasonableness is "generous" and allows "for a very broad range of reasonable resolutions." *Laikin*, 119 F. Supp. 2d at 843.

> The standard takes into account uncertainty regarding issues of fact and law, the parties' varying degrees of risk aversion, the burden of litigation on the abandoned insured, and the wide ranges of damages awards that can be proper where an injury is not subject to precise quantification. So an insurer's challenge to a consent judgment's reasonableness is not "an opportunity to relitigate issues based merely on 20/20 hindsight" or based on an insurer's belief that it could have negotiated a better deal. Even if the insured's evaluation of the litigation risk is arguably mistaken, a reasonable settlement will stand. A court should view the consent judgment from the perspective of the insured at the time of the agreement, "keeping in sharp focus the premise that the insured breached its contract and left the insured hanging, exposed to the serious risk of devastating personal liability."

*Kras v. Conifer Ins. Co.,* 2016 WL 6893686, at *7 (N.D. Ind. Nov. 23, 2016) (internal citations omitted)(quoting *Laikin*, 119 F. Supp. 2d at 843).

Further, "[t]he reasonableness issue should be decided as a matter of law unless there were clear grounds for finding the settlement fell outside any reasonable bounds for valuing the underlying dispute." *Laikin*, 119 F. Supp. 2d at 845

> Courts often say that reasonableness is a question of fact, of course, but special considerations in this situation would lead the Indiana courts to set a high bar for an insurer challenging a settlement reached by its insured after it has wrongfully abandoned that insured.

*Id.*[15]

Having now set out the applicable law and mindful of Indiana's views above, the Court is at a distinct disadvantage to decide this issue based on the briefing and evidence submitted presently. Kinsale has briefed the issue entirely based on Florida law, which this Court has determined does not apply. Second, both parties' briefing focused on the wide range of issues raised in this litigation and the Court believes they have given short shrift to the evidentiary and legal basis that underlies both their arguments on this issue. Now that the Court has resolved the lion's share of the issues in the litigation, the Court believes that the parties and the Court would be best served to address this claim in isolation. Accordingly, the Court DENIES both parties'

---

[15] "A trial on the reasonableness of a settlement would effectively amount to a complex trial within a trial. At the core would be the evidence on the underlying claims--the evidence of liability, injury, and damages--in other words, a trial closely akin to the trial both the insured and the injured parties sought to avoid by entering into the settlement in the first place… Layered over that trial of the core events, however, would be evidence about how the underlying litigation proceeded, about the course of the settlement negotiations (both objectively and from the subjective views of the participants), and about the factors that led the parties to agree on the terms they reached. That evidence, moreover, would invite a further layer of evidence in the form of opinions from lawyers, claims adjusters, and perhaps mediators and judges, expressing their views on the reasonableness of the settlement terms."

motions for summary judgment on Count VI of Kinsale's counterclaims, without prejudice to refiling. The Court will set out a deadline for dispositive motions limited to this claim in the conclusion of this Opinion and Order.

### C. Breach of Contract Claim (Plaintiffs' Count III)

Plaintiffs have also moved for summary judgment on Count III of their Amended Complaint which asserts a breach of contract claim against Kinsale for Kinsale's failure to defend RSO in the Underlying Suit. (ECF No. 103: "Plaintiffs cross-move for summary judgment as follows: …Count III for breach of contract for Kinsale's breach of it insuring agreement for which Plaintiffs are third party beneficiaries…"). Although Plaintiffs ask the Court to grant them summary judgment, the briefs (on either side) do not independently address this claim. Plaintiffs simply ask the Court to find as a matter of law that Kinsale breached the insurance contract with RSO.

But that presupposes that Plaintiffs have some basis to assert a contract right when they are not a party to the insurance contract between Kinsale and RSO. Plaintiffs mention they are third-party beneficiaries of the insurance contract between Kinsale and RSO, but they provide no supporting argument or explanation for why that is so. And, in any event, Indiana law seemingly forecloses that argument. *Harleysville Lake States Ins. Co. v. Carl E. Most & Son, Inc.*, 2024 WL 3105833, at *33 (S.D. Ind. June 24, 2024):

> "Indiana follows the Direct Action Rule, prohibiting a third party or judgment creditor from directly suing a judgment debtor's insurance carrier to recover an excess judgment." *State Farm Mut. Auto. Ins. Co. v. Estep*, 873 N.E.2d 1021, 1026 (Ind. 2007) (citations omitted)…Indiana law, however, does allow a third-party who qualifies as a third-party beneficiary under the contract to sue for breach of contract. *See Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (citing *OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1314-15 (Ind. 1996)) …

*Id.* The Court explained further that to qualify as a third-party beneficiary:

> [I]t must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed.

*Cain*, 849 N.E.2d at 514 (quoting *OEC-Diasonics, Inc.*, 674 N.E.2d at 1315).

Plaintiffs haven't explained how the Policy in this case imposed an obligation on Kinsale to benefit the Plaintiffs nor have they cited any case law that would show they are third-party beneficiaries entitled to bring a breach of contract action against Kinsale. Rather it appears that they base their third-party beneficiary status solely on their belief that as a judgment creditor of RSO from the Underlying Suit, it stands in their shoes to assert a contractual breach. Given that Indiana law clearly precludes that finding, and the Court has nothing from which it could conclude as a matter of law that Plaintiffs are third-party beneficiaries, Plaintiffs' Motion for Summary Judgment on Count III of the Amended Complaint is DENIED. Further, because it appears clear on the record that the Plaintiffs are not third-party beneficiaries as a matter of law, the Court *sua sponte* GRANTS summary judgment on Count III of the Amended Complaint to Kinsale.

### D.  Request to Conduct Proceedings Supplemental (Plaintiffs' Count IV)

Given that this Court has left open Kinsale's counterclaim relating to whether it is bound by the consent judgment in the Underlying Action, the request to conduct proceedings supplemental is premature. Both the Plaintiffs' Motion for Summary Judgment and the Cross-Motion for summary judgment on this claim are therefore, DENIED.

### <u>CONCLUSION</u>

The Underlying Action and this related action have been ongoing for over 5 years. This Opinion and Order resolves many of the issues but there are undoubtedly significant litigation risks faced by the parties to continue litigating this matter. But hope springs eternal and the Court is optimistic that by this Court's resolution of the majority of the issues raised on summary judgment, the parties will see their way to resolving this action without further court intervention. For now:

- Kinsale's Motion for Summary Judgment (ECF No. 93) is GRANTED in part and DENIED in part. The Motion is DENIED on Counts 1 and IV of Plaintiffs' Amended Complaint[16] and on Counts I, III, IV, V, and VI of its counterclaims. The Motion is GRANTED on Count III of Plaintiffs' Amended Complaint.

- Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 103) is GRANTED in part and DENIED in part. The Motion is GRANTED as to Count I of their Amended Complaint (see fn. 16) and as to Counts I, III, IV, and V of Kinsale's counterclaims. The Motion is DENIED on Counts III and IV of its Amended Complaint and on Count VI of Kinsale's counterclaims.

- Count II of the Plaintiffs' Amended Complaint seeking a declaratory judgment that the Policy's intellectual property coverage is illusory and Count II of Kinsale's counterclaims (Known Claims Exclusion) are DISMISSED.

- The denial of the parties' cross-motions for summary judgment on Count VI of Kinsale's Counterclaim is without prejudice to refiling.

In accordance with the request for Declaratory Judgment, the Court declares as follows:

1. The Judgment in the Underlying Suit falls within the Insuring Agreement for Coverage B, "personal and advertising injury," subject to the limits of insurance and deductible set out in the Policy;

2. The Unauthorized Acts Exclusion does not apply to exclude coverage under the Insuring Agreement for Coverage B of the Policy;

3. The Business Conduct Endorsement does not modify the coverages under the Insuring Agreement for Coverage B of the Policy; and

---

[16] To the extent Count I sought a declaration that Kinsale must indemnify RSO under the Judgment, that question remains open and is intertwined with Kinsale's counterclaim in Count VI. For clarification only, the Court has determined that the Judgment falls within the Policy's coverage. It has not concluded that the Judgment is enforceable against Kinsale.

4. The Plaintiffs are not third-party beneficiaries entitled to bring suit for breach of the insurance contract between Kinsale and RSO.

The issue of whether Kinsale is bound by the consent Judgment reached in the Underlying Action remains disputed and will be addressed after the filing of dispositive motions as directed herein. The parties are encouraged to engage in settlement discussions within the next 60 days. Absent settlement, the parties are directed to file, on or before January 15, 2025, renewed motions for summary judgment related solely to the issue raised in Count VI of Kinsale's counterclaims, that is, whether the Judgment is enforceable against Kinsale under Indiana law. Additionally, the parties' brief should discuss the consequence and/or remedy if the Court concludes that the Judgment is unreasonable or was obtained through collusion or bad faith.

SO ORDERED on September 30, 2024.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT